Amy Joseph Pedersen, OSB No. 853958
amy.joseph.pedersen@stoel.com
Edward A. Piper, OSB No. 141609
ed.piper@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR  97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

    Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NIKE, INC., an Oregon corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>MATTHEW MILLWARD, an individual, and RALPH LAUREN CORPORATION, a Delaware corporation,<br><br>    Defendants. | Case No._____:<br><br>COMPLAINT<br><br>(Breach of Contract; Tortious Interference with Contract)<br><br>JURY TRIAL DEMANDED |

    Plaintiff Nike, Inc. ("Nike"), by and through its undersigned counsel, brings this action against Matthew Millward ("Millward") and Ralph Lauren Corporation ("RLC"), and alleges as follows:

Page 1  -  COMPLAINT

**INTRODUCTION**

1.    This case concerns a senior, highly compensated former Nike apparel designer who was given broad access to Nike's most competitively sensitive trade secrets and other confidential and proprietary business information, such as detailed product designs, technical specifications for new and advanced materials used in those products, product launch dates and launch plans, collection planning materials, and other similar information.  In his role as the Senior Apparel Design Director for Nike Sportswear ("NSW"), Millward was intimately familiar with and responsible for key segments of the NSW apparel line and other innovative Nike products, such as the NikeLab ACG apparel line and Nike's 2016 Olympic "Medal Stand" jacket.  Many of those products are still in the planning phase and have yet to reach the market.

2.    The information to which Millward was given access during his employment is a core Nike asset of immeasurable value, and its strict confidentiality is critical to Nike's continuing success in the marketplace.  For that reason, as a condition of his employment, Nike required Millward to execute Nike's Covenant Not to Compete and Non-Disclosure Agreement (the "Agreement"), in which, among other things, he promised not to compete with Nike for one year following the termination of his employment.  In the Agreement, Nike also agreed to continue to pay Millward during the one-year noncompetition period, even though Oregon law does not require any such payment.  In reliance on his unambiguous promise to not compete with Nike for one year following the end of his employment, Nike gave Millward broad access to many of its most confidential design and planning materials.

3.    Millward resigned from Nike effective October 6, 2015.  He has accepted a senior position with RLC as Vice President of Men's Design for its Club Monaco brand.  In that role—and in direct violation of his obligations to Nike—he is responsible for designing, or supervising

the design of, the same types of apparel that he worked on during his employment with Nike; Club Monaco's line of activewear competes directly with NSW products. Despite notice from Nike, both Millward and RLC have chosen to continue violating Nike's legal rights. Accordingly, to protect its trade secrets and other confidential and proprietary information, Nike has no choice but to bring this action.

## PARTIES

4. Nike is an Oregon corporation with its principal place of business in Beaverton, Oregon.

5. Millward is an individual residing in New York, New York. He was employed by Nike from November 12, 2012, until October 6, 2015.

6. RLC is a Delaware corporation with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), *i.e.*, based on diversity of citizenship and because the amount in controversy exceeds $75,000.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Nike's claims occurred in the State of Oregon.

///

///

///

///

# FACTS

**A.  Millward Played a Key Role in the Development of Numerous Cutting-Edge Nike Products and Was Given Access to a Broad Range of Highly Confidential Information.**

9.  Until his resignation in October 2015, Millward was a senior, highly compensated Nike designer who enjoyed broad access to Nike's most competitively sensitive confidential business information.  He held the position of Senior Apparel Design Director, which he assumed on November 12, 2012.  His base salary was $215,000 per year.

10.  At Nike, Millward oversaw the design of cutting-edge NSW apparel.  NSW is a line of footwear and apparel that is designed and manufactured by Nike and is referred to as "athleisure" apparel.  Athleisure apparel, which also is sometimes referred to as "activewear," is a fashion trend in which clothing is inspired by traditional athletic wear, but is intended to be worn in non-athletic settings, for example, while shopping, out with friends, or even at work.  Nike refers to this style of clothing as "sportstyle innovation."  The industry, building on Nike's innovation, refers to this fashion sensibility as "athleisure."  Athleisure is one of today's hottest fashion trends, and Nike has been publicly recognized as a market leader in the area.

11.  In his role as a senior designer, Millward was responsible for managing the look and feel of new NSW products, creating original concepts for products, selecting appropriate materials, and making modifications to products to ensure manufacturability.  His duties also included creating the short- and long-term design vision for NSW and executing Nike's business plans, including its brand plans.  He was responsible for driving the financial and operational performance of his group.  He supervised a team of nine designers and reported to Nike's Vice President and Creative Director for Apparel.

12.     Throughout his employment, Millward had access to a broad range of Nike's trade secrets and other highly confidential, competitively sensitive business information.  Much of that information concerned the design, development, launch, and marketing of innovative NSW apparel and included detailed designs of products that still have not yet been released to the market, technical specifications for new and advanced materials used in those products, product launch dates and launch plans, collection planning materials, and other similar information.  In particular, Millward contributed to and worked frequently with Nike's "Innovation Roadmaps," which are critical, highly confidential documents detailing the company's years-long strategy to develop and bring new apparel to market, as well as other similar and equally sensitive slideshows, diagrams, sketches, and other planning materials.

13.     Additionally, unlike most Nike designers, Nike entrusted Millward with confidential, highly sensitive design information from numerous different performance categories outside of NSW (Tennis, Running, Basketball, etc.), which Nike often incorporates into its NSW designs.  For example, a designer working on Nike Tennis products typically is unable to access information related to Nike Running products.  Millward, however, had access to confidential design information related to a broad range of Nike performance categories and regularly incorporated such information into NSW products.  In other words, Nike entrusted Millward with a level of access to its most competitively sensitive confidential business information that few other Nike designers enjoy.

14.     Apart from his work with NSW, Millward was intimately involved in two other unique Nike Projects.  The first was the design of the "Medal Stand" jacket for the 2016 Summer Olympics, which all U.S. athletes will wear when they receive their medals and which Millward took a lead role in designing.  The jacket has not been released to the marketplace, and its design

remains highly confidential. With advance access to the jacket's confidential design elements, Nike's competitors—including RLC, which previously has supplied other apparel to U.S. Olympic athletes—would be able to inflict substantial competitive harm on Nike. Specifically, with that information, a competitor could design a knock-off product and have it ready to hit the retail market before or at the time when Nike's Medal Stand jacket makes its initial splash in the media.

15. Second, Millward played a key role in the NikeLab ACG collection, which was announced in December 2014 and launched in 2015. Other additions to and iterations of this special collection currently are being designed and developed, but have not yet reached the market. This special Nike collection is the product of a collaborative design process between Millward and designer Errolson Hugh, the owner of design studio ACRONYM. NikeLab directly connects with Nike's other high-profile performance categories, such as Running, Basketball, and Soccer, to capitalize on Nike's performance-driven collections. As a result, Millward worked closely with these other categories in creating various NikeLab collections. The NikeLab ACG collection is designed to be functional for urban dwellers by providing mobility comparable to activewear, together with additional weather protection. The ACG collection employs many of Nike's most advanced materials and concepts. The plan for the collection's future and its interaction with NSW were conceived by Millward and his collaborators.

16. Nike's competitors, including RLC, would be able to inflict substantial competitive harm on Nike if they were to obtain any of the trade secrets or other highly confidential business information to which Millward had access during his employment. None of that information is known to Nike's competitors or available to the general public.

Page 6  -  COMPLAINT

**B.    Given Millward's Extensive Access to Its Highly Confidential Business Information, Nike Required Millward to Execute a Noncompetition Agreement.**

17.    In light of the extreme sensitivity of the confidential business information to which he had access, Nike required Millward to execute the Agreement before he began work. Nike informed Millward that the noncompetition agreement was required as a condition of his employment in an October 23, 2012, offer letter.

18.    Millward executed the Agreement on October 25, 2012.  In it, he acknowledged that he "will be or has been exposed to and/or is in a position to develop confidential information peculiar to NIKE's business and not generally known to the public as defined below ('Protected Information')," and that "[t]he nature of NIKE's business is highly competitive and disclosure of any Protected Information would result in severe damage to NIKE and be difficult to measure." Accordingly, Millward agreed in paragraph 1(a) of the Agreement that:

> [d]uring [his] employment by NIKE, under the terms of any employment contract or otherwise, and for 1 year thereafter (the "Restriction Period"), [Millward] will not directly or indirectly, own, manage, control, or participate in the ownership, management or control of, or be employed by, or consult for, or be connected in any manner with, any business engaged anywhere in the world in the athletic footwear, athletic apparel or sports equipment, sports electronics/technology and sports accessories business, or any other business which competes directly with NIKE or any of its parent, subsidiaries or affiliated corporations (a "Competitor").

A copy of the Agreement is attached to this Complaint as Exhibit A.  Paragraph 1(d) of the Agreement provides that Nike will continue to pay Millward 50 percent of his final salary if Nike elects to enforce its rights under the noncompetition clause.

**C.    Millward Quit Nike and Joined RLC in Violation of His Agreement.**

19.    Millward resigned from Nike effective October 6, 2015.  On November 19, 2015, Nike learned that Millward had started work at RLC as Vice President of Men's Design for the

company's "Club Monaco" brand. On information and belief, in that position, Millward is performing substantially the same duties for RLC as he did for Nike, *i.e.*, overseeing the design of Club Monaco's athleisure apparel and other similar product lines.

20. RLC's Club Monaco brand contains a large number of the same items of apparel as Nike's NSW line, many of which Millward was responsible for designing. Therefore, many of the products that Millward will be responsible for designing for Club Monaco are practically the same as apparel he designed during his employment with Nike. Specifically, like Nike's NSW apparel, much of Club Monaco's activewear line targets the "athleisure" market.

21. For example, Millward designed and Nike sells a range of apparel, including the following Nike items. On its website, RLC advertises its Club Monaco brand, which also sells the same type of activewear apparel. Many Club Monaco products are similar to Nike's, as shown in the following six comparisons:



Page 8    -    COMPLAINT

80720994.4 0063718-00215





Page 9    -    COMPLAINT

 



///

///

///

Page 10 -   COMPLAINT



Notably, even the names of many of Club Monaco's products contain the same elements as the names of Nike products, such as "Tech" and "Woven." Club Monaco even advertises the "Tech Thermal Full Zip" shown above as a "sporty outer layer." And its Gusseted Sweatpant is advertised as exemplifying its activewear collection's "athletic-inspired slant."

22. On October 15, 2015, Nike notified Millward that it intended to enforce his noncompetition obligation, triggering its obligation to pay Millward 50 percent of his final salary during the restricted period. Nike has fully complied with its obligations under the Agreement. Nike did not learn until November 19, 2015 that Millward was in violation of his noncompetition obligations by actually working for RLC.

23. RLC is fully aware of Millward's obligations under the Agreement. Despite knowing that Millward is obligated to not compete with Nike for one year following his resignation from Nike, RLC continues to assist Millward in violating his obligations under the

Page 11 -    COMPLAINT

Agreement by employing him in a position in which he competes directly with Nike by designing and developing apparel.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Breach of Contract—Millward)

24. Nike realleges and incorporates by reference the allegations in paragraphs 1 through 23 as though fully set forth herein.

25. Millward's Agreement is a valid and enforceable contract. As a condition of his employment with Nike, and in consideration of the access that Nike gave him to its trade secrets and other confidential business information, Millward promised and agreed that he would not compete with Nike for one year following the termination of his employment. Nike fully performed its obligations under the Agreement by employing Millward and by granting him access to its trade secrets and other confidential business information.

26. Millward breached, and continues to breach, paragraph 1(a) of his Agreement by working for RLC in his current position.

27. Nike has been and will continue to be irreparably harmed by Millward's ongoing employment with RLC in violation of his Agreement. Through Millward, RLC will have access to all of Nike's current planning for its Sportswear line through approximately 2018. Use of that information by RLC would severely harm Nike's competitive advantage in the market for apparel by allowing RLC to poach ideas and designs that Nike has spent years and hundreds of thousands of dollars developing. Accordingly, Nike is entitled to temporary, preliminary, and permanent injunctive relief barring Millward from working for RLC for a period of one year, in

addition to the period during which Millward has been or remains in breach of his obligation under the Agreement not to compete with Nike.

## SECOND CLAIM FOR RELIEF

### (Tortious Interference with Contract—RLC)

28. Nike realleges and incorporates by reference the allegations in paragraphs 1 through 27 as though fully set forth herein.

29. RLC intentionally interfered with, and continues intentionally to interfere with, the Agreement by employing Millward, knowing that doing so violated and continues to violate Nike's rights under the Agreement.

30. RLC intentionally interfered with the Agreement for an improper purpose, *i.e.*, to gain access through Millward to the trade secrets and other confidential, proprietary business information to which he had access during his employment with Nike, and that it would not otherwise be able to obtain through legitimate means.

31. RLC's intentional interference with the Agreement by employing Millward has directly and proximately caused irreparable and ongoing harm to Nike. Accordingly, Nike is entitled to temporary, preliminary, and permanent injunctive relief barring RLC from directly or indirectly employing Millward for a period of one year, in addition to the period during which Millward has been or remains in breach of his obligation under the Agreement not to compete with Nike.

WHEREFORE, Nike prays for relief as follows:

1. An order temporarily, preliminarily, and permanently enjoining Millward from working for RLC for a period of one year, in addition to the period during which Millward has

been or remains in breach of his obligation under the Agreement not to compete with Nike;

2. An order preliminarily and permanently enjoining RLC, and its agents, servants, employees and all persons and entities acting in privity, concert, or participation with it, from directly or indirectly employing Millward for a period of one year, in addition to the period during which Millward has been or remains in breach of his obligation under the Agreement not to compete with Nike;

3. An award of economic damages in an amount to be determined at trial; and

4. Such further relief as the Court deems just and proper.

DATED: December 7, 2015.

STOEL RIVES LLP

*s/ Amy Joseph Pedersen*
AMY JOSEPH PEDERSEN, OSB No. 853958
EDWARD A. PIPER, OSB No. 141609
Telephone: (503) 224-3380

Attorneys for Plaintiff Nike, Inc.